Gosh, last case of the day, here comes our caboose. Appeal 14-15-37, United States v. Tyrone McMillian, Jr. Hi, Mr. Henderson. Good morning, Judge. May it please the court. This, I think, is a very interesting case, especially in light of the conversation our country's been having since the events of Ferguson, Missouri, where we've been talking about the militarization of police. What happened in this case was that on July 6 of 2011, a tactical unit that resembled basically a paramilitary force surrounded Tyrone McMillian's residence without a warrant, based on a statement from an informant about a crime that happened three and a half years earlier. The officer called Mr. McMillian's girlfriend to the door. She came out. And he called and ordered Mr. McMillian to the door. And while he was standing in his house, placed him under arrest without a warrant. After Mr. McMillian was removed from the house, the tactical unit then did a thorough search of Mr. McMillian's house without a warrant. And while that search was undertaken, the officer noticed Mr. McMillian didn't have shoes on because he'd been coerced out of his home. And got implied consent, as the district court found, to enter the residence again. The case is striking because the errors don't stop there. After the officers had discovered gun cases in the home, they then asked for a search warrant from an officer who prepared, really, a very insufficient search warrant as to the homicide counts. And contained the illegally obtained information about the gun cases. And that led to a federal indictment and a sentence of 77 months in prison. The main, I suppose, legal disagreements in terms of what happened is there is this kind of niche area of Fourth Amendment jurisprudence about doorway arrests. And the witnesses that the district court found credible said, no, Mr. McMillian was in his home when they effected the arrest. I think that factual piece is really not the most important piece. I think one of the most important pieces is the fact that Mr. McMillian did not appear at his door voluntarily. But isn't it clear from the record that the challenge to the arrest was not made in the district court because it would have been fundamentally inconsistent with the version of events that were presented by McMillian and Knuckle in seeking suppression of the evidence. Specifically, their claim that they both exited the house and closed the door to the residence prior to the arrest. So, I mean, I wonder why should it matter that the district court did not find that testimony credible when the point here is that it wasn't raised because it wasn't supported by their own version. Right, and I suppose there's two answers to that. One is that on appeal, we really defer to the district court's findings. And we have to evaluate whether, given those findings, this arrest was lawful or not. I think the second thing is, too, what I just mentioned. Even if they were outside, and we haven't really addressed this much, but even if they were outside, the reason they were coerced out of their home was that there was a six to seven person paramilitary unit standing outside of their house. And they were called to the door. They weren't told you're under arrest or we have authority to arrest you. Mr. McMillan was simply told, turn around, he was handcuffed, and he was removed from the house. The other thing, too, if we put aside the whole arrest, the protective sweep was certainly an argument that was made below and was preserved. The implied consent that occurred occurred while the tactical officers were effecting that unconstitutional search of the home. Did you argue to the district court that the consent was tainted by the unlawful sweep of the residence? And did you present any testimony as to how the knowledge of the sweep impacted the consent? And if you did, where can I find it? Where is it in the record? Where is it in the record? The best answer I have for that is that Mr. McMillan pretty clearly said the protective sweep was unlawful, and the fruits of that sweep should be excluded from evidence. Now, the precise kind of legal argument that we've made on appeal, I think, fleshes that out as to what exactly the fruits of that search are. But specifically, there wasn't really an, and I know you weren't the lawyer in the district court, but specifically, there wasn't, nobody said the consents tainted because of the bad sweep. I think that's right. I think the government's concession kind of made everybody say, OK, well, that's out, and then they focused on other issues. Back on the issue about where the arrest happened, which, again, wasn't challenged by the lawyers who had it in the district court, so one of the things the government says in their brief is that if this had been raised, we could have done things differently. We could have called more witnesses. We could have done this, done that. Well, do you have a response to that? Well, I mean, the main witness would have been Officer Schell. He was the one there. He was at the doorway, and he clearly testified that Mr. McMillan was inside the house. His testimony was credited. You know, it's one of those situations where I think below, the parties each had their version of events and thought that their version of events was constitutional, and you get on appeal, and the version of the events that the government was kind of promoting at the district court level, I think, was unconstitutional. And so, you know, there's some readjusting. And, you know, again, that's why arguments should be made in the district court. But I don't see any further evidence, unless Officer Schell were to come in and, after he's testified twice already, contradict himself in a third evidentiary hearing. I don't see any other witnesses who would be able to give that. The suggestion, I guess, I would have, if there's some unclarity in the record, is to say to the district court, specifically, we know that you found the officer credible in his version of the events, but specifically, did you find the officer credible when he described that Mr. McMillan was inside the residence? I think the government's complaint is more about the specific findings you have to kind of divine from the record, as opposed to Officer Schell would somehow contradict himself on a further evidentiary hearing. The taint, obviously, extends, I think, to the search warrant and to the subsequent seizure of the evidence. I don't think, legally, there's much there. But I do think that a good analogy is the Siebert case, where it seems, and again, maybe this is why it was unchallenged, that the Milwaukee Police Department has a policy, or at least they do in this case, of arrest first, get a warrant second. Arrive with a tactical unit, an intimidating force, arrest somebody out of their home, and then get the warrant. I think that's unreasonable. I think the Fourth Amendment protects against that. So I'll reserve the rest of my time. Thank you very much. Good morning. Good afternoon, Mr. Wall. Good afternoon to the court. And may it please the court, Mr. Henderson, Peter. I take issue with a number of points here that Mr. Henderson has made. First of all, factually, and I do want to point out that this was not a paramilitary unit. This was the Milwaukee Police Department tax squad. They were going to a house on a probable cause, double homicide, historic double homicide, but still a double homicide. And as Officer Schull testified, this is considered to be a dangerous arrest. That's why you have a number of officers, and that's why you use the tax squad here. I also take a very strong issue with the characterization that Mr. McMillan was inside of his house. He was not inside of his house. The magistrate found, quote, he was inside the frame of the doorway. That's the frame of the doorway. She didn't say he was behind the frame of the doorway. She didn't say that he was on the other side of the doorway or behind a closed door. This is kind of like the NFL. If you break the plane, it counts. In other words, if he's standing in the doorway, I'm standing in the doorway, if part of me is past the imaginary plane, then that's outside. Well, if we look at the Santana case out of the US Supreme Court, which is a 1976 case, and we look at the facts of that, that had to do also with a doorway arrest. And that was found to be valid. And the Supreme Court said because Miss Santana was in public view, that is, she could be, first of all, she could be viewed in the doorway by the public. She could be talked to in the doorway. She could be heard from the doorway. She could actually be touched from where she was standing. And because she was there and she had exposed herself to the public, that was enough. And in that case, she actually ran back into the house. And then the police officers ran in and arrested her. And it was found to be valid under exigency and everything. But here, we have very, very clear findings of fact that McMillan came to the door. They yelled his name. And he came to the door. And he was standing within the threshold of the doorway in full view of the public. And I think that's the most important thing. He was not inside of his house. He was not in his living room. He was not in his bedroom. Nobody went inside of the house. The second time that Officer Shull testified, he pretty much said the same thing and said, well, one of his legs was actually over the threshold of the door. And we have to look at that because the issue was not in front of the court or in front of Officer Shull that this was an illegal arrest. That was never brought up below, as the court noted earlier. So he's not tailoring his testimony to make it seem like, well, he was outside. McMillan was in the doorway. And Shull says that at least one of his legs was actually over the threshold of the doorway. And under Santana, that's public. I'm sorry. I'm going to get into the shoes. Even if the statements and actions regarding retrieval of the shoes indicates implied consent, how do you think we can say that the consent wasn't tainted by the unlawful search of the entire residence that had just occurred? Because wouldn't a person be much more concerned to consent to a search if that person believes that law enforcement has already seen anything that's in plain view anyway? There's two different analyses here regarding the effect of the protective suite. One is whether the consent was voluntary. And the magistrate went through those factors and recognized that the protective suite had gone on. And actually, the protective suite was occurring at the time McMillan asked that somebody go in the house and get his Nike Air Jordan black flip-flops. That's what he wanted. And he told the officer exactly where they could be found, because that's what he wanted. So it goes, first of all, to voluntariness, which the magistrate handled. The second part, the second way to analyze that, is the way it's been brought up in the appellant's brief. And that is that there's a causal connection between the two under the Robles-Ortega case and that whole line of cases. And my response to that is that that's a complete non-starter. Because those cases involve law enforcement looking to get evidence. And they're exploiting something to go and get evidence. In this case, Officer Shull wasn't trying to get evidence. And the magistrate so found. She said he had no intent to search the bedroom or any other area of the house. And he did not do any search. He was simply going back into the house to get the footwear that McMillan was requesting. And his girlfriend said, I know where they are. Follow me. And during the course of that, as he reaches down to get the exact footwear that Tyrone McMillan wanted, instead of the footwear that was right by the door, he sees the two gun cases. So the appellant brief references the recent Supreme Court decision in United States versus Jones by saying a physical intrusion into a protected area is a search under the Fourth Amendment. That's not accurate. Throughout that case, the court gives guidance as to what does constitute a search. And the court says that at page 949, the government physically occupied private property for the purpose of obtaining information. Footnote 5 at page 951, likewise with the search, trespass alone does not qualify. But there must be conjoined with that what was present here, an attempt to find something or to obtain information to get evidence. And then again, later at 951, the court said a trespass on houses or effects or a cat's invasion, that is the Fourth Amendment expectation of privacy invasion, is not alone a search unless it is done to obtain information. So all these have a purpose. And the purpose is what makes it a search, that there's something over and above just going into the house. In this case, he's going into the house to get these black flip-flops. And that's it. And I would note, again, as to both lines of attack here, that these were not brought up in a district court. McMillan had at least eight opportunities to raise the issue of the unlawful arrest. In his house, again, he wasn't in his house. He was in the threshold. And as the court points out, his own argument is going to be that, well, I walked out of the house and shut the door behind me, and that's when I was arrested. So there's no good cause here. This is waived. If it's not waived, then we should look at Santana. The two Seventh Circuit cases, Berkowitz and Sparring, are also very instructive and give some guidance as to what's appropriate. And clearly, what happened here is very appropriate. And the argument that there's taint that goes to the search warrant, that's not accurate. The finding of the rifle case in a different bedroom was stricken from the search warrant affidavit. And what was left of that search warrant affidavit, the magistrate and the district court found to be sufficient. And that was Officer Shule's observation of the gun cases. So there was no taint left in that search warrant. It was stricken. And probable cause was still there. There was probable cause for the gun search. There was not probable cause for the homicide search. And I've abandoned that argument completely because that search just had to do with computers and clothing, and that's not relevant to this case. Thank you. Thank you very much. Mr. Henderson, two minutes. To address some of Mr. Wall's points, the reason I use the term paramilitary is because Officer Shule agreed that when they go search houses and do search warrants, yes, they look like a paramilitary force in black uniforms. The discussion, again, of the doorway. Santana involves somebody who's voluntarily in her doorway. And because of the exigency that was created when she fled, the Supreme Court upheld that. That's reasonable. Berkowitz and Sparring are really this court's more recent examination of Santana. And what's key is that voluntary presence at the doorway. We've noted that the case basically has become an exigency case, as the Supreme Court cited it. But again, we've got this paramilitary force outside of Mr. McMillan's home calling him to the door. He's not voluntarily in the doorway. This is not Santana. This is basically the rules that Berkowitz and Sparring put out. The last thing, I really don't think there's actually a legal question that entering a home is a search under the Fourth Amendment. That seems to me to be very well established. But I do question the government's insistence that there was no search involved here, that the officers weren't looking for anything. They explicitly came to the house without a warrant to pick up Mr. McMillan, to question him, because they thought he was involved in the homicide. But they really didn't have anything more than that. And so instead of getting a warrant, instead of going through the procedures that the Constitution demands, they surrounded his house with armed officers dressed in intimidating garb, forced him out of his house, handcuffed him, and then searched his house twice and recovered the evidence that was used to put him in prison for 77 months. So we would ask this course to reverse and grant the motion to stress. Thank you. Thank you. Thanks to both counsel. And as with all other cases, the case will be taken under advisement. And this court will be in recess until tomorrow morning at 930. Thank you, everyone. Have good trips back.